Thank you, Judge Thomas, and may it please the Court, my name is Neal Katyal, and I represent Dr. Hui Hsiung, who is known throughout the papers in this case as Kuma, and I'll be addressing three issues, Metro Industries, the extraterritoriality of the Sherman Act, and the One Overt Act jury instruction. And my colleague, Dennis Reardon, will be addressing the FTAIA and corporate fine issues, and my colleague, Mike Antonazio, will discuss venue. And we'd like to reserve approximately eight minutes of our collective time for rebuttal, and we'll manage that. Here's our simple point. The Court flatly decided in Metro Industries that foreign conduct cases are governed by the rule of reason, quote, where a Sherman Act claim is based on conduct outside the United States, we apply rule of reason analysis to determine whether there is a Sherman Act violation. That simple sentence disposes of this case. The prosecution. Maybe. And I hear what you're saying because that's what the decision says. My question is this. If you read that decision in context, what I think it was saying in conjunction with that sentence is that you have this sui generis Korean organization that grants the certifications and that it doesn't really, it's not really like our normal per se price fixing. It's not like a horizontal arrangement that one would normally see. And, therefore, because of that and it's sui generis and it's foreign, we don't apply the per se rule. So if you read the whole opinion in context, I think that's a reasonable reading of it. And I'm interested in your comments on that. Judge McKeon, we have two responses to that. The first is to focus on precisely what you said at the outset of your question, which is what the decision says. Because I don't think the context gets away from the actual literal words of the decision. So you're absolutely right. There is the discussion at the beginning about does this really look like a horizontal market allocation. And then here are the words of the court. This is at page 844. Quote, even if Metro could prove that the registration system constituted a market division that would require application of the per se rule if the division occurred in a domestic context, application of the per se rule is not appropriate when the conduct in question occurred in another country. And that language is right after the language you were discussing about horizontal market allocation and this looking different. So that's the first thing I'd say. The second is, and I hesitate to, you know, obviously, you all know the rules of your court and when you go on bonk more than I do. But I read the court's decision in Miller v. Gammie and in Miranda B. is answering that question. In Miranda B., this Court said, quote, where a panel confronts an issue germane to the eventual resolution of the case and resolves it after reasoned consideration in a published opinion, that becomes the law of the circuit regardless of whether doing so is necessary in some strict logical sense. And so this is something that we had been raising from the very start of this case. We filed in the pretrial motions on because we thought this prosecution was just fundamentally flawed from the beginning. And, indeed, my client, Kuma, he, Taiwan doesn't have an extradition treaty. The reason he came here voluntarily to the United States is because he thought he had done nothing wrong. He wanted to tell his side of the story and say what I did was reasonable. And the government blocked him from doing that at the get-go. And Judge Ilston gave a jury instruction that said that. And, indeed, there were evidentiary instructions at the beginning that said you can't even consider, can't even bring any evidence up, we couldn't bring any evidence about reasonability up. The government didn't have to prove mens rea. It didn't have to prove anti-competitive conduct. That's precisely what our defense would have been. He should have been able to tell his side of the story under binding Ninth Circuit precedent. But isn't all of your arguments are all based upon really a factual distinction, a factual distinction that you're arguing that everything occurred overseas, and there's very concrete facts that occurred here, both with your venue issues, with the interpretation of the case and how the case was distinguished by the district court, and with the jury instruction, because there was activity that was occurring, even an office or a place of business and decision-making that was occurring within the Northern District of California? Judge Kendall, that is certainly the government's argument. We think it's wrong for two reasons. Whichever test this Court applies to decide what is foreign conduct, we think this case undoubtedly meets it. It looks very much like Metro Industries. Everything you just said, Judge Kendall, about the amount of domestic conduct that was at issue in this case was true in Metro Industries. The very first line of Metro Industries of this Court's opinion explains that this is a United States plaintiff alleging injury to United States commerce, that they rule in Metro Industries, the thing that was anti-competitive, only governed exports. They – it was a product that was being imported into the United States and by a defendant that did a substantial amount of business in the United States. That's all just in the first line of the opinion. And so everything that you said here is true there as well, and yet this Court said that is a foreign conduct case. And we think that that simply disposes of this case. Well, if you look at the pleadings in Metro and how it came up, when they look at what the conduct was alleged, it's basically the Korean design registration system. That in and of itself is wholly foreign conduct. And it seemed to me that that was the basis on the summary judgment, and it was only – it was only from its denial of the cross-motion for summary judgment, which while you have all the facts you've just recited, when you really look at what the conduct was that the Court targeted, it was simply the Korean registration system. So piggybacking off of Judge Kendall, doesn't this – don't you have to really kind of get underneath to see how the case arose in the court of appeals? I don't think so, for two reasons. Number one, of course, this Court's language, I started reading some of it to you at the beginning of my argument, and there's lots more throughout the opinion, is much broader than the facts of this – of the Metro Industries case itself. It applies to all foreign conduct cases. Okay? So that's – that's point one. And point two is that – Sotomayor, have you heard of dicta? I mean, you know, there's always an argument of what's dicta and what is this case. But how do you factor that in? Your Honor, I think this Court confronted a similar thing in both Miranda v. Endangami, and they said when the Court has intentionally considered an issue, that's enough. And here, you know, these paragraphs are very explicit in Metro Industries. This is not some ill – you know, something that was just tossed overboard akin to what Judge Tashima was saying in some of the earlier en banc cases. This is something that was considered by the Court. There's a lengthy exposition of it. And indeed, there's been a debate in other circuits about it. And that's why Judge Aldiser of this Court in LSL said, look, I disagree with Metro Industries. I'm bound by it as a judge in a case which had different facts, by the way. But nonetheless, I've got to apply it. And we think the same thing applies here. And of course, the argument that you're saying about Metro Industries, that the establishment of the design system was all abroad, the same argument is true here. The conspiracy was all abroad. The essence of the conspiracy – the essence of conspiracy, as the Supreme Court has said in the Shabani case and in Summit Health, is the agreement. And everyone agrees the agreement happened abroad. That's the touchstone for what conspiracy is. And so, you know, even if we were to read Metro Industries in the narrow way that you're suggesting, we think it automatically would govern this case because the same thing. There was the establishment of the design system. Here it is the agreement. Both things occur abroad. And so, therefore, we think it's squarely a foreign conduct case. Kagan. But if we read it in the broad way that you are interpreting us, asking us to interpret it, what is the district court doing then, sorting out at some point, free trial, how much conduct occurred here, how much occurred internationally, and then making a determination as to whether the rule of reason applies? Well, of course, Judge Kendall, we don't think we're reading it broadly. We're reading actually just literally the very words of the decision. Humor me. But, of course, we think the district court here would do exactly what it does in every other rule of reason case, which is, you know, apply the standards that govern antitrust cases generally throughout the system. And, yes, you're right, the district court will have to make a determination, is this a foreign conduct case or not? That's the kind of determination district courts do time and again. This Court just did it. But isn't that really what she did? I mean, made a determination at the basic level, which was that this is a Sherman Act case. There is activity here within the violation. It's a per se violation. Didn't she, on the briefs, look at that? Well, she looked at it, but I don't think that she, you know, I don't think that it was analyzed properly. That is, I think that she said metro industries. She tried to make these arguments about it being dicta and so on. I just don't think ultimately they work. And that's, you know, it's an unfortunate thing. We tried to warn the government of this from the start. This is why we wanted to put on our defense, and we weren't able to do so. If the Court has any questions on extraterritoriality, I'm happy to address them. If not, I'd like to move to the one overt act jury instruction just as a final thing. There, our simple point is, for the first time, as far as we can tell, the Court accepted a jury instruction that said just one overt act in the United States is enough, let alone Judge Kendall, all the kinds of things you were talking about pointing to, all the different domestic aspects. Just one thing was enough. And we can't find precedent for that idea, that just a single, you know, sale of one widget alone is enough to trigger Sherman Act liability and put these folks in jail for a lengthy jail sentence. Under a 371 charge? Is that on the conspiracy charge? Well, this is a Sherman Act charge.  Okay. Thank you, counsel. Good morning, Your Honors. Dennis Reardon for the AUO and AUOA corporations, if it please the Court. Your Honors, this case went irretrievably off the tracks when the government obtained the indictment in the case, on its ‑‑ which reflected its position that the FTAIA had nothing to do with this case. It's puzzling that the Justice Department would take that position, because six years before that, the United States Supreme Court had said that all foreign activity, anti‑competitive activity, is subject to the general rule of the FTAIA, that it is not violative of the Sherman Act. It doesn't say if there's foreign activity or ‑‑ and there's some domestic activity, the FTAIA doesn't apply. What it says is that the FTAIA applies to all foreign conduct, which is anti‑competitive, and then, once it applies, the government would then, or the plaintiff would be required, to bring the case back in to the Sherman Act under one of the exceptions, what it calls the exceptions of the FTAIA, that is, import activity or the direct, substantial, and reasonably foreseeable impact on domestic commerce. It describes those as facts which have to be proved in order to bring foreign activity back in to the FTAIA, the Sherman Act. There's just every case which has applied the FTAIA, every case involved American companies or subsidiaries, and involved American conduct. Empagram, in fact, the United States Supreme Court says that this case involves an impact on American commerce, but the fact that it had an impact on American commerce did not change the fact that the FTAIA applied to the foreign conduct, anti‑competitive conduct, and, therefore, the government had approved one of the exceptions to bring the case back within the Sherman Act. Kagan. So is it your argument? I don't want to mess you off of the who's doing what. But is it your ‑‑ are you arguing the part about the indictment being insufficient? Yes, Your Honor. Okay. So for the ‑‑ what I don't understand about that is, what other area of law is there in the criminal code that would require that the government present to the grand jury an exception rather than the elemental pleading for the grand jury to review the document? Well, Your Honor, all criminal law says that if there's a fact necessary to prove a crime, the government has to prove it. And in this case, if you had an indictment that said, here's foreign anti‑competitive activity and nothing more, it would be dismissed under Empagram. That does not state a crime, unless the government pleads the facts which make it a crime, and that is import activity or reasonable, direct, and substantial. Then it hasn't ‑‑ it hasn't alleged a crime. If it got to trial and simply proved foreign anti‑competitive activity and did not prove one of these exceptions, as the Supreme Court says, it has to prove an exception to the general ‑‑ the exception here, Your Honor, let me phrase it this way. The exception is not to criminality. The exception is to legality. In other words, the FTIA makes all of this legal. So in order to make it illegal, the government has to prove one of the elements, as the Third or Seventh Circuit has said. So it is your position, then, that the exception is an element of the crime that needs to be presented to the grand jury? Absolutely. I mean ‑‑ Well, let's take that ‑‑ let's assume that's true, because what you're basically saying is you can't have a Sherman Act violation if you don't meet these exceptions. If you don't plead ‑‑ Otherwise you don't have a crime. That's right. Okay. So if I take that as true and if I were to accept your position, then the question is whether a statement of that, although not exact words, is contained in the indictment. And so as I go through there, I see on the, for example, the import exception, I talk there, there's substantial language in the indictment about the shipping into the United States and the trade with the United States after these meetings and what occurred. I don't see the words, you know, the substantial relationship, of course. So my question on that is, do you need the magic words or do you just need the magic facts? Under this Court's opinion in Milanovic, the magic words are the terms of the statute. The en banc decision in Milanovic says that if you plead in the words of the statute and if you unambiguously plead every element, then the indictment is satisfactory. Your Honor, the word import does not appear here. Can I just ask a clarification on that? I know that's true. So in other words, you can save yourself by doing that. That's how I read that case. But if you don't do that, are you do you automatically have a deficient indictment or can the indictment be saved if the facts basically allege what is the magic words? Well, two responses to that. Unless the indictment unambiguously states the import exception, it hasn't alleged the element. Imports is a term of art. It does not mean things which reach the United States, Your Honor. And at the end of the case, finally, the government revealed, during closing argument for the first time, its import theory. And it was that goods were sent directly from abroad, sold directly into the United States. That allegation is not anywhere in the indictment. And the reason that it's so critical, Your Honor, the reason that it's so critical is that AUO never imported, as that term is defined by the law, never imported goods into the United States. It never imported panels here for production. The only testimony is that a handful, maybe a couple, of panels were sent to HP for the purpose of evaluation and marketing. But it did not, whatever the case of other defendants or alleged co-conspirators, AUO was not an importer. And had the import exception been adequately involved, the opening statement in this case, and had the Court even, even the Court compounded it because it refused to instruct on the elements preliminary that it eventually accepted, had it indicated to the defense that it was going to instruct on that, those elements, the defense could have gotten up in the opening statement and said, ladies and gentlemen of the jury, what is this case about? It's a foreign case. It has nothing to do with us. We don't import into the United States. But it had no, it could not have known that it would have a defense of no imports because not only did the indictment not charge imports, the Court refused to accept the import theory of the government or, or designate it as, as a necessary element of the government's case until closing argument. Well, it did charge a Sherman Act violation with a foreign entity, and it charged facts of how that played out. So maybe a motion for a bill of particulars would have been sufficient because the case law, of course, on the bill of particulars is a great example, on a charging element of the affirmative act, the violation of the Sherman Act is present, then that's all that's sufficient in order for the indictment to stand. Then you as a defense counsel might seek to find out what is the theory behind this affirmative element, right? Well, two things, Your Honor. We made a motion for a bill of particulars, and the district court denied it. But secondly, we know that if we had asked, we did ask in the bill of particulars for the theory, it was denied. But we know that even at the beginning of the trial, the Court refused to say whether, in its view, the government had approved the import exception. And so then is it your theory then because they didn't affirmatively assert the import exception as an element within the charging document before the grand jury, then that is why the jury that reached the conclusion on their argument at the eleventh hour under your theory had a constructive amendment of the indictment, right? And so that's the dismissal theory that your part of your argument is. And, Your Honor, we know this. Judge McEwen was raising, is there inferentially some facts in the indictment from which you could infer elements? The test, the reason for the Sixth Amendment grand jury requirement of pleading every element is not to ensure that a court or a trial judge or an appellate court could infer that the elements existed. It's to assure that the grand jury found probable cause for every element required to convict of the crime. And we know that the grand jury did not, because the government stood up incessantly before trial and said, we did not plead the FDA, IA, in the indictment, and we didn't have to. So there's no way that we can say, oh, we know the grand jury found every element of the offense, when we know they didn't, because the government didn't ask them. Okay. You didn't answer the one question I asked a few minutes ago. I'm sorry. One more time. Which is, what other body of law in the criminal code has a requirement that an exception be presented to the grand jury as an element? Well, the — I suppose I'd respond as the Third and Seventh Circuit had. They said these are elements. And every case of this Court and the United States Supreme Court says you have to plead elements. Now, whether the United States Supreme Court used the word exception to describe these two, but in doing so, what it said is, everything's legal except if it's not. And once you say except if it's not, you're talking about an element of the crime. And was that in a civil case that you're referring to on the Supreme Court side? Yes. That's an epigram. An epigram. So, I mean, I do see some difference when you put it in the criminal context, that you might — one might not read so much into that Supreme Court language because it came from a civil case, whereas in a criminal case, you do have to lay it out. You ought to lay out each of the things you're alleging. Well, that's absolutely true, Your Honor, because in a civil case, a judge on summary judgment can decide the existence or nonexistence of an element. But in a criminal case, of course, only the petit jury can do that, and the requirement exists that the grand jury do it as well. And your argument is if because it's not in there, that that's the — that's an automatic reversal. It is under this Court's decision, and Omer, which several members of the panel are very familiar with, in terms of automatic reversal. And it has to be that way because otherwise you could just dispense with the grand jury process entirely and say, if you get a verdict at trial, then no harm, no foul. As Justice Scalia has often said, no, it's not simply a guarantee of a fair verdict or a fair trial. It's the — these guarantees are dictates of the Constitution as to how fair trials or criminal proceedings will be conducted. And one of those very important assurances is the assurance of the requirement of a grand jury indictment that is adequate. I'm prepared to answer other questions. I do want to yield the floor to the microphone to Mr. Attanasio on the venue issue. I have one more. I have the question regarding the Seventh Circuit's decision in MnChem. And that's where, in part, they're agreeing with you. But in the end, what they do is they then apply the Hartford Fire substantial and intended effects test, and that affirms. So is that your theory? Is that the theory that you would espouse that this Court take? Well, we — we agree with that in this sense. What they said in that case was that even if you get past the FDIAA requirements, you always have the Hartford Fire requirements, which are in some ways lesser and in some ways greater, the greater on the intent element. So if you were able to establish that there was $1,000 of imports, that might take you out of the FDIA, but then you have to satisfy the substantial and intended effect of Hartford, which is why we concur with my co-counsel argument that the instruction on Hartford Fire was defective because of this alternative structure where you had to prove Hartford Fire or you didn't. The instruction was sort of, if there's a $5,000 requirement for an offense, you have to prove $5,000 unless you have to prove $100. Well, then you don't have to prove $100. So the binary instruction on Hartford Fire was — was plainly defective because it — it allowed the jury to convict without satisfying the Hartford Fire test. Thank you, Your Honor. Thank you, counsel. Good morning. My name is Mike Attenasio. I represent Chuan Van Chen. I would like to briefly address the constitutional defect below. The constitutional defect below is a procedural quibble which involved the failure of the government to prove venue in terms of the violations charged. It's tempting to think of this as a procedural quibble, and it's tempting to think that it's relatively easy for prosecutors to prove venue, as they almost always do. They do that by calling a witness who says, when this thing happened, a phone call, a negotiation, an email, I was in this office, in this city, in this district, or using electronic means, such as an email. The government often proves the location when that email was sent by using the IP address. None of those things happened here. And the venue guarantee, particularly apt to think about here, where you have two individual defendants who came from Taiwan voluntarily, whose entire history in this case, factually, involved events in Taiwan, not one in the U.S. It may be a question of individual defendants, but there's testimony in the record about where did you go. Well, we went to all the big manufacturers, you know, Compaq, HP, et cetera, because we thought everybody else would follow. And then there's more specific testimony about HP and Cupertino and HP selling to this Global Product Services. So my question, then, is, given that testimony and given the preponderance of the evidence for venue, why that wouldn't be sufficient? Your Honor, fair enough. First of all, with respect to HP, which was really the core of the government's venue attempt to save their venue position, that that only involves a time frame from September of 2001 to May of 2002, when HP relocated its procurement office to Texas. During that time, although there's this general construct, oh, HP was in the district, the Northern District of California, there's no evidence whatsoever that any particular act, any particular phone call, negotiation, or email actually occurred there. That brings us squarely within this Court's decision in Pace, where although the secretary for the corporation in Pace, which involved a wire fraud scheme, testified that all the relevant players would communicate with that office in Tucson, the Court held, and although there were two wire instructions given to that office in Tucson, this Court held that that's not enough. There has to be some particularized showing by the government that a witness can testify, this happened when I was in this district, or this was sent to this district. None of that happened here during the very small window. I'd also like to point out, why are you limiting it to that small window if we have a conspiracy? We just need to have one overt act occurring within the district, right? During the entire time of the conspiracy by any co-conspirator, right? Yes. All right. And I only was limited to that because of the government's emphasis on HP and then the question about HP. But there's testimony. Maybe I'm missing something here, but there is testimony about going to the U.S. to go to HP to discuss prices and that following these meetings that took place in Taiwan, that they then used these reports and they went to negotiations. There's some e-mails. I'm not sure. Maybe I'll have to hear from the government on this, but I'm you're suggesting an absolute absence. But when I read the transcript, I see Cupertino. I see basically the executives traveling to the United States. So what am I missing? The government's position is venue established by geography. And I somewhat hear that in the Court's question, and that is fair. But I have to say, like in Pace, there must be something more particularized. And like in Dorades, which we also cite, there must be – it's not enough to say there was a pattern of conduct or there was a generalized notion. But when you have actual executives traveling to the United States in the district so that they can implement these pricing arrangements, is that not particular enough? I don't think that's in the record. I don't think that's in the record, that an executive such as Michael Wong, who was from AUOA, the American subsidiary, he could have been asked, but he wasn't. For instance, the government could have taken up Your Honor's question, Mr. Wong, did you travel from Taiwan to the Northern District of California and then do X? What I'm suggesting to the Court is that never happened. And I'll just finish by saying we would draw particular attention to the misstatement of the evidence in the prosecutor's rebuttal when we had no opportunity to respond. It misstated the record concerning this HP business and whether there were negotiations. Judge Ilston, when there was an objection made, asked the prosecutor, is that an evidence? The prosecutor said, yes, that is an evidence. That was not correct. We proved that in our brief. And Judge Ilston then overruled the objection. That's a critical point in this trial where venue, it turns out, was hotly disputed. It wasn't right. It wasn't fair. And under Hine, it was a due process violation. The Court, as the district courts often do, should have said to the jury, your recollection of the evidence controls, and if Judge Ilston overrules the objection, fair enough. But to say to the prosecutor, is that an evidence, have the prosecutor say, yes, it is, when it's not, and then overrule the objection, that was not right. Thank you, Counsel. Thank you. We'll give you some time for rebuttal. Thank you, Your Honor, and may it please the Court. I'm Kristen Lamarzi here for the United States. Defendants and their co-conspirators systematically fixed the price of LCD panels, set up offices in the United States to sell those price-fixed panels to U.S. purchasers, and together reaped more than $500 million in illegal profits at the expense of their U.S. customers. None of this is in dispute in this appeal. Instead, defendants claim that theirs was a pro-competitive price-fixing conspiracy, and they should have been allowed to argue that to the jury. To make this argument, defendants read this Court's decision in Metro Industries to sweep away 80 years of Supreme Court precedent, treating price-fixing as per se illegal, in a manner that would hamstring prosecutions of hardcore cartels that rob American consumers. There's no need to read the opinion that way. The Metro Court said what it meant five times. Determining whether foreign conduct is illegal under the Sherman Act requires an inquiry into its effects in the United States. Kagan. So then should it have been fled that way in the indictment? Lamarzi. That's – it was – Kagan. Was that presented to the grand jury for them to review? Lamarzi. Excuse me. The test in Metro Industries that Metro Industries articulates, which it relies on Hartford Fire for, applies only to wholly foreign conduct. And it was wholly foreign conduct that was at issue in Metro Industries. Kagan. But I think what Judge Kendall is moving also to the other point, and that is if you read Metro that way to basically incorporate Hartford Fire as the foundation, you are by implication getting yourself into the FTAIA. And then the question is, where do you see that in the indictment? Lamarzi. I'm happy to turn to the FTAIA. Kagan. Well, we all move back and forth, possibly. Lamarzi. Are we taking – Kagan. There's only one of you arguing, right? Lamarzi. You're arguing. My – my argument is that the test in Metro Industries, which parrots Hartford Fire, applies only to wholly foreign conduct. The indictment alleges acts in the United States. It also alleges an impact on U.S. commerce. It alleges that the defendants fixed the price of panels sold into the United States, and specifically that they gained $500 million from that activity. So I think it adequately alleges both of those pieces. The FTAIA is separate, right? The FTAIA is a statute that sets forth exceptions to the reach of the Sherman Act. And the exceptions make the application of the Sherman Act turn not on where the conduct takes place. Mr. Rudin said this morning that the FTAIA applies to foreign conduct. The FTAIA doesn't require any conduct in any particular spot. The language of the statutes makes clear it makes the application of the Sherman Act turn on the type of commerce involved or affected. And but it does not state an element of a Sherman Act offense. The defendants were charged with violating Section 1 of the Sherman Act, and the elements of a Sherman Act violation are, as they have always been, that the government must prove there's a conspiracy and unreasonable restraint of trade, the defendants knowingly joined it, and that the conspiracy occurred in the flow of or affected interstate trade among the several states or with foreign nations. What the FTAIA does is it delineates in a separate section exceptions to the Sherman Act, categories of conduct to which the Sherman Act does not apply. It's in its structure, not unlike a statute of limitations defense, right? A statute of limitations says no person shall be prosecuted for any offense unless an indictment is found within five years. Well, the FTAIA says the Sherman Act is different than a statute of limitations defense. It's basically saying to have a Sherman Act violation, you need these things. So it seems to me that's a little bit different than a statute of limitations defense, which is you could state a claim, but I can undo it if I have a statute of limitations affirmative defense. Well, I think it is akin, Your Honor. It states that the Sherman Act, just like the statute of limitations says no one shall be prosecuted unless, the FTAIA says the Sherman Act shall not apply to certain things, non-conduct involving non-import foreign commerce, unless these certain effects are shown. With respect to the conduct involving non-import foreign commerce, I mean, excuse me, with respect to conduct involving import commerce, the FTAIA doesn't say anything at all, doesn't require anything at all. The Sherman Act just applies as it ordinarily would. So I think it does the same thing. Sotomayor, would you give us a little reprise of the government's position at the trial on this statute? Certainly. Our position has been, with respect to pleading the FTAIA, consistent that it we did not, we were not required to plead it specifically in the indictment because the indictment states a violation of Section 1. But nevertheless, there are, as you pointed out earlier, Judge McKeown, the facts in the indictment are sufficient to state that the conspiracy both involved the FTAIA. I think I mentioned, maybe I wasn't probably very precise in my question. The various counsel for the defendants have indicated that that's now the government position, but that during trial that there was an affirmative flight from the statute and it wasn't until you got all the way to the end that it was squarely on the table. No. I think that that misstates the record. And what I would point you to is Record Excerpt 1599 to 1623. That's the government's motion which was, or pleading rather, which was filed in November, a little less than two months before the trial began, before Jury Broideur began. And that was in response to defendant's motion. They wanted to have the court instruct the jury on the FTAIA and Hart for Fire pretrial, before the trial began. And the government opposed that among other reasons. We felt that an instruction on the FTAIA before the jury knew even what the case was about was going to be unduly confusing. But in that pleading, we laid out, if the court was inclined to give an instruction on this, we explained exactly what it ought to be. And it's exactly the same instruction we proposed at the close of evidence, and it's virtually identical to the instruction that the court gave on the FTAIA. It states that the jury could convict if it found that the defendants fixed the price of panels sold in or for delivery to the United States, that is, in import commerce, or if it found they fixed the price of panels put into finished goods sold in the United States, and that that conduct had a direct, substantial, and reasonably foreseeable effect on import commerce. The effect is substantial. Kagan. So let me understand, if you take that instruction, that's basically putting those two items as elements of the offense, correct, in terms of what the jury needed to determine? No. That's not exactly right, Your Honor. The – it's true that they appear in the court's recitation of the elements in the jury charge, and I'll explain why. The third element of a Sherman Act violation requires the jury to find the conspiracy occurred in the flow of or affected trade among the several states or with foreign nations. The nexus to U.S. commerce required by the FTAIA in cases where the FTAIA is put at issue, that's a higher burden. That is, if the jury finds the evidence meets the requirements of the FTAIA instruction, they've necessarily found the third element. Instead of giving both, giving the third element instruction, the ordinary third element instruction, and an FTAIA instruction, which we thought would be confusing, we suggested to the Court that she essentially replace the third element with this FTAIA instruction. So that's a backwards way of saying the answer to my question is, yes, that for this jury, the FTAIA became an element of the Sherman Act. That's right. We explained why we were doing this to the district court at the time, and that's at record 1620. But you're right. To the jury, that would have been seamless. I don't think they would have appreciated that. They were certainly required to find that the conspiracy either involved import commerce or direct substantially and reasonably foreseeably affected import commerce. But don't you find this a little bit odd to have the elements described or found at the end of the case? In response to the defendant's motion, Judge Olson said this, and I thought it was somewhat striking. After hearing the evidence of the conspiracy's domestic component, the Court will consider whether the final instruction should include elements derived from Nippon Paper and the Act. It does so at the of course normally we have the elements that are presented to the grand jury and found. And here the Court is saying we're going to hear the evidence and then we'll determine what elements of the crime apply. Don't you find that's a bit odd? I think the FTAIA, it does not apply in really the vast majority of antitrust cases. Right? True. In a case where the bond. But this is square in the middle of one where it does. No doubt. And the government doesn't dispute that. But I think what Judge Olson was getting at there was that the FTAIA, because it states a defense, it states a limit to the Sherman Act, that she wanted to hear how the evidence came in to see if it was even implicated. That is, if the ordinary instruction. No, I take it that way. But she was treating, instead of saying affirmative defense, she said include elements derived. So if it's an element of the offense, it should have been presented to the grand jury. And the government's position is that it's not, Your Honor. And if the government, if we were to disagree with you on the element of the offense, I could understand where some of the indictment might support the foreign import. But the substantial effects, or whatever the precise language is, certainly is not in the indictment. And usually, of course, the easiest way for the government to put forward an unimpeachable indictment is to quote language from a statute. How do you divine that aspect from the indictment? Sure. This conspiracy, the direct, substantial, and reasonably foreseeable effect it had was on import commerce in the finished goods that incorporated the conspirators' price-fixed LCD panels. The indictment alleges that defendants' conduct, quote, substantially affected foreign trade or commerce. And specifically, it alleged that defendants fixed the price of panels for use in notebook computers and desktop monitors, and that those finished goods were sold into the United States. That is, in import commerce. It also provided additional details about the nature of those finished goods. So while I agree with you that an indictment that charges in the language of the FTAIA would have been perhaps less controversial, I think this indictment is no less sufficient, both because, as I said, it states the elements of a Section 1 violation, which is the crime charged, but also because it states the facts necessary to apprise the defendants that their conduct is within the reach of the Sherman Act once you consider the FTAIA. So you're basically charging within here Hartford Fire-type language? Well, Hartford Fire is a separate ---- Yes. But yes, the indictment alleges both conduct in the United States, which would take us out of the Hartford Fire realm, and also that the conduct had, that the defendants' conspiracy had a substantial and intended effect in the United States. It alleges the substantial terms of the conspiracy were to agree to fix the price of panels for use in finished goods in the United States, that the panels, the conspirators agreed on pricing of LCD panels sold to customers located in the United States. And in terms of actual effects, of course, it alleged that the conspirators derived gross gains of $500 million on these price-fixed panels. So I think it does allege facts sufficient to meet the Hartford Fire test. Did you have a discovery schedule that made you provide the information earlier than a few weeks before trial? Were you turning over through your Rule 16 obligations materials to the defense? Like, for example, when they moved for the bill of particulars, was all of the material turned over far in advance of trial? Yes, Your Honor. We did turn over material far in advance of the pleading that I referenced to you. I point you to the pleading because it's very specific and, in fact, proposes the very instructions that defendants claim they were surprised by. Right. Well, that's what I'm trying to get to in the idea of requesting information and whether or not the information that supported your allegations was turned over in advance of trial. Yes, Your Honor. If I could, unless the Court has further questions on that, I would just turn quickly to Respond to Defendant's argument about Part A of the territoriality instruction, which allowed the jury to convict based on an overt act in the United States. Defendants have characterized this as a one-touch rule, but that's not the case. To convict, the instructions require the jury to find at least one overt act in the United States. In furtherance of a conspiracy, they had already found either involved U.S. import commerce or adversely affected U.S. import commerce. So we're not saying that if you make a phone call from an airport lounge in Hawaii to fix prices entirely in Chinese commerce, you're suddenly subject to the Sherman Act. But if you act in the United States to further a conspiracy that both involves and adversely affects U.S. commerce, absolutely that violates the law. And that's what these instructions told the jury. I would also note, and we've said it in our brief, of course, even if the Court disagrees with Part A of the – that Part A of the instruction was a correct statement, any error in that part of the instruction is harmless beyond a reasonable doubt. The evidence of substantial and intended effects in this case is truly overwhelming. I can turn to venue unless the Court has further questions about that or about metro industries, which we got away from rather quickly. Do you have – I mean, to adopt your position, we would have to basically read metro industries as somehow in the end shying away from the statement that any foreign conduct has to be judged by a rule of reason. I think you – to adopt the way the government reads the opinion, yes. We think that the opinion fairly read states that wholly foreign conduct – to determine whether wholly foreign conduct violates the Sherman Act, you have to look at effects. That's uncontroverted and doesn't tell you anything more than Hartford Fire. The – What are we going to do with all those naked statements in the opinion? Well, I think the Court does use the term rule of reason, and of course, all restraints of trade are subject to the rule of reason because only unreasonable restraints violate the Sherman Act. The per se rule applies to a subset of restraints that are so obviously anticompetitive that the ordinary analysis can be short-circuited. You don't need to look at justifications and you don't need to look at actual effects in those cases. In metro, because the conduct was wholly foreign, an inquiry into effects was necessary, so the Court makes clear the ordinary per se rule doesn't apply. But the opinion doesn't suggest, as AUO would have you hold, that the Court contemplated analysis of possible justifications for price-fixing. There are no justifications for price-fixing. The rule of reason, it's not a single test. The Supreme Court tells us it's an inquiry meet for the case. And here, the Court was clear about the inquiry that it was talking about, and it was an inquiry into effects. But, of course, there's a – I'm sorry? That's adding a lot of language to the case. It's not clear. The discussion on this issue is quite brief. I think it's four original sentences and a quote from Hart for Fire and a quote from Matsushita. Even if the Court doesn't agree with the government's reading of the case, there's plenty of other ways to deal with metro industries, plenty of other reasons why metro makes no difference here. And chief among them is that metro is easily distinguished on its facts. Whatever test metro required, it required it because the conduct at issue was wholly foreign. It was a restraint cooked up by a Korean trade association of Korean exporters, Korean patent attorneys, and ministers from the Korean government. Defendants have argued and continue to argue today that the appeal in a metro involves some domestic conduct. That's not the case. And if the Court has any doubts about that, I'd be happy to go through the opinion again. But we've explained it in our brief. In any event, it's a very far cry from this case where AUO and its wholly-owned U.S. subsidiary were convicted of conspiring to fix prices to U.S. customers, and its employees acted in the United States both to collude on pricing and to market and sell those price-fix products to major U.S. companies. So for that reason alone, metro simply doesn't apply here. With respect to venue, Your Honor, the question on appeal is whether viewing the evidence, including circumstantial evidence in the light most favorable to the government, any rational trier of fact could have found it more likely than not that a single act in furtherance of this conspiracy took place in the district. The evidence is that AUOA maintained an office in the Northern District of Virginia, that its employees, Michael Wong and Evan Wong, were based in the district. Their job was to negotiate the sale of these price-fix panels to AUOA's customers in the United States. And we know from the Supreme Court's cases of Trenton Potteries and Succoni Vacuum that every act to effectuate the sale of a price-fix product is an act in furtherance of that price-fixing conspiracy. Well, the jury heard that Michael Wong, from Michael Wong himself, that it was his job to do this, to sell these panels to Dell and Apple and HP, and that he and his colleagues did this through in-person meetings, e-mail and telephone. They also heard Mr. Wong testify about his communications with his counterparts at the conspiring firms, discussions of what prices they would be offering. The jury saw e-mails from Mr. Wong and Evan Wong reporting on those communications with their co-conspirators, including one in which Evan Wong warns his colleagues that their conduct is illegal and they ought to do a better job concealing it. To conclude there's no venue here, the jury would have had to have assumed that even though their offices were located in the district, every time Michael Wong and Evan Wong did any of these things, they got in their car and left the district. Nothing obligates the jury to come to such a counterfactual conclusion, and nothing obligates this Court to either. There was reference earlier to whether Michael Wong traveled from Taiwan into the district. Michael Wong didn't need to travel from Taiwan into the district. He was based in the Northern District of California. He lived here and worked here throughout the conspiracy, and it was his job to implement this price-fixing conspiracy. If the Court has any other questions on any of the other issues, I'd be happy to address them. Otherwise, we'll rest on our papers. Sotomayor, do you want to address the fines issue? I'd be happy to, Your Honor. And whether or not there's support for holding the all of the defendants responsible for that entire fine. Sure. The plain language of 3571d allows for an alternative maximum fine when any person derives pecuniary gain from the offense. And in this case, the offense is the conspiracy to fix prices. AUO's position is that you should rewrite the statute to base the maximum fine not on the gain to any person, but only on the gain to AUO, and not from the offense, but from some subset of the offense conduct. And there's just no basis to depart from the plain language of the statute here. Okay. Any further questions? All right. Thank you, Your Honor. We'll give you six minutes. Thank you very much, Judge Thomas. I don't say this lightly. This is one of the more troubling prosecutions I have seen. The government disregarded this Court's binding law from the get-go. And I don't think, with all fairness to my friend from the other side, that Metro Industries fairly read says what the government says it does. And the best evidence of that is to look to the one sentence that she read to you from the case itself, which is a sentencing about determining whether the registration system was a violation would require examination of the system. That sentence merely says that if that — it merely says the Sherman Act applies extraterritorially. It doesn't say if you meet Hartford Fire or something like that, that you get out of the rule-of-reason analysis. Indeed, quite to the contrary, that sentence comes from Part B of the opinion. It's preceded by, Judge McHugh, in the sentence I read to you about even if it's not horizontal price-fixing, rule-of-reason analysis applies. The section is called foreign conduct cannot be examined under the per se rule. And the only reason the Court later in the opinion goes on to discuss the effects is because they say rule-of-reason analysis applies, and now we have to examine whether or not it's pro-competitive behavior or not. And so in order to buy their position, I think, as you said, Judge McHugh, and you'd have to disregard the naked statements of this Court, or as Judge Thomas, you said, you'd have to add a lot of language to the opinion. What the opinion says is that price-fixing is governed by per se analysis, and — excuse me, by rule-of-reason analysis. And I think that that ultimately decides this case. Now, my friend on the other side made another argument. She said, well, this isn't really foreign conduct case, whereas in metro industries it was, and picking up, I think, on what you were talking about, about the procedural posture of metro industries. I went back and looked at that procedural posture. Before this Court, before the Ninth Circuit, there were two United States subsidiaries as defendants, and indeed, this Court at page 847 in metro industries said that the design system in Korea was impacting United States — exports to the United States. All of that is true here. Whatever the rule was in metro industries applies at least a fortiori here when you're talking about the agreement occurring abroad, the products being sold abroad, the panels being sold abroad, and so on. And Judge Kendall absolutely can understand that at some point, maybe district courts are going to have some difficult line-drawing questions. This isn't even close to that case. This is like Chao-Fon-Zhu or the DK case in the Fourth Circuit in which courts are And this one, the facts are pretty overwhelming in saying that this is predominantly foreign conduct. The agreement happened abroad. That's the touchstone for what conspiracy is all about. If there are any other questions, I'm happy to answer them. Thank you. Two quick points. The government said something that didn't make any sense. It described the FTIA as containing exceptions to the Sherman Act. No, the FTIA, as the Supreme Court says, holds that all foreign conduct is outside the Sherman Act unless it's brought back in. So, obviously, the things necessary to bring it back in have to be proven, pled and proven by the government, and they are elements, as the Third and Seventh Circuit have held. In one minute, I'm going to lay to rest any claim by the government that this is a FTIA, which clearly does apply. At page ER-1606, the government said this of the Court's pretrial ruling. The Court did not essentially reserve ruling on whether the FTIA or Hartford Fire and Nippon Paper allegations were necessary elements of the case. Rather, the Court found such allegations were unnecessary and denied AU's motion to dismiss. If we agree, and we have to under Milanovich, that at a minimum the elements of the crime have to be unambiguously stated in the indictment, we have the drafter of the indictment saying they were unnecessary. So how can they be unambiguously stated if the government's position is they're not in there and they didn't have to? And then turning to Judge Thomas's question, and it made me reflect on something, no district court judge in this country would take an indictment that contained elements, an indictment by the government, approved by the grand jury, containing elements and say, I'm going to delete elements from that indictment and not instruct on them. So what we have is we know Judge Ilston did not conclude that this indictment did not contain the elements of the FTIA, and she was going to make a decision at the end of the trial as to whether the evidence justified them. But if they had been stated in the indictment, she would have never said, I'm going to make up my mind later as to whether they're really there or not. And on prejudice, prejudice isn't necessary. But the first time the jury saw the chart, which was the government's only evidence on the import exception, was in closing argument. The government gets up in closing argument and says, you haven't seen this before, but here's the chart that shows direct imports into the United States, none of which were from AUO. So I just think it's indisputable that this indictment did not charge the elements of the FTIA. Thank you, Your Honor. Thank you. You have 20 seconds on venue. Real fast, Your Honor. Michael Wong did not live in this district and work in this district throughout the period of the conspiracy. Much of the time, he was in Texas with a client called Dell. That record is clear. It's in both briefs. So it's overstating the facts quite a bit to say he was here the whole time. Indeed, all of the e-mails, as we've pointed out, do not show where they were sent from or where they were sent to. An e-mail can be sent from anywhere to anywhere in terms of physical location of the sender. All the government had to do in its briefs was point to this court, here's the e-mail, here's the witness testimony that puts a body in this district. And I just would urge the court to look at the government's brief for that simple statement, that simple statement. It's not there. Thank you, counsel. Thank you all for your arguments and briefing in the case. And we'll be in recess for the morning.
judges: Kendall, Thomas, McKeown